### COMMERCIAL NAT. BANK v. ARMSTRONG.

*(Circuit Court, S. D. Ohio, W. D.   August 30, 1889.)*

**1. PRINCIPAL AND AGENT—BANKS AND BANKING—COLLECTIONS.**
The F. Bank offered to "collect at par" all paper sent it by complainant, "and remit" on specified dates." Complainant accepted the offer on a letter-head containing the printed words: "For collection, ——; for credit, ——." All paper sent under this agreement, was, at the suggestion of the F. Bank, indorsed, "Pay F Bank for collection ——, for" complainant. The F. Bank thereafter wrote to complainant that "we collect at par, and include in our remittances everything collected to date." All paper sent by complainant was charged on its books to the F. Bank, "cash items" on transmission, and "time items" on their collection by the F. Bank, on whose books like credit entries to complainant were made. While complainant's cashier testified that in making such charges he understood that the F. Bank became indebted to complainant, he also stated that it was not intended to transfer the paper to or open a deposit account with the F. Bank. *Held*, that the relation between the F. Bank and complainant as to paper sent by the latter was that of principal and agent, and not that of creditor and debtor.

**2. SAME.**
Such relation also continued as to proceeds of such paper collected by the F. Bank.

**3. TRUSTS—IDENTIFICATION OF TRUST FUNDS.**
Complainant can recover on the ground of a trust, from a receiver of the F. Bank, which has failed, such portion only of the proceeds of its paper sent to the F. Bank as it shows has passed into the receiver's hands either in its original or some substituted form.

In Equity.

Bill by the Commercial National Bank of Pennsylvania against David Armstrong, receiver of the Fidelity National Bank, to recover certain funds.

*Harmon, Colston, Goldsmith & Hoadly*, for complainants.

*E. W. Kittredge, Jos. Wilby*, and *W. B. Burnet*, for defendant.

JACKSON, J.   The general object and purpose of the bill in this case is the recovery of certain funds, which the complainant claims are impressed with a trust character in its favor, and which it is alleged have come into the possession of the defendant as the receiver of the Fidelity National Bank of Cincinnati.   The trust character of the fund claimed is disputed, and that constitutes the real controversy between the parties to the suit.

The material facts of the case, as established by the evidence on which the questions of law arise, and the right to the relief sought depends, are

the following, viz.: The Fidelity National Bank, desiring to open and establish business relations with the complainant, addressed to it, under date of February 12, 1887, the following circular letter and propositions:

"*Coml. Nat. Bnk., Philadelphia, Pa.*—GENTLEMEN: Inclosed herewith we hand you our last statement, showing us to be the second bank in Ohio in deposits in the tenth month of our existence. We should be pleased to serve you, and trust you will find it to your advantage to accept one of the following propositions:

"No. 1. We will collect all items at par, and allow $2\frac{1}{2}$ % interest on daily balances, calculated monthly. We will remit any balance you have above $2,000 in New York draft, as you direct, or ship currency at your cost for expressage.

"No. 2. Will collect at par all points west of Pennsylvania, and remit the 1st, 11th, and 21st of each month.

"No. 3. We will collect at par Ohio, Indiana, and Kentucky items, and remit balances every Monday by draft on New York. We do not charge for exchange on propositions No. 1, 2, and 3.

"No. 4. Will collect Cincinnati items, and remit daily at 40 cents per thousand, or 20 cents for $500 or less. National banks not in a reserve city can count all they have with us as reserve. Your early reply will oblige."

To this communication the Commercial National Bank replied on February 18, 1887, accepting the second of the above propositions. This letter of acceptance was written upon one of the printed letter-heads which complainant was in the habit of using in its general business intercourse with correspondents, relating to paper received or transmitted for collection; the printed portions of the letter being in the following form:

"COMMERCIAL NATIONAL BANK OF PENNSYLVANIA.

"PHILADELPHIA, ——— 188—.

"To —— National Bank ——.

"Yours of —— inst. is received, with inclosures as stated.

"Respectfully,

———————,

"For Cashier.

"I inclose for collection, ———; for credit, ———."

Along with this letter of acceptance complainant transmitted certain sight drafts or checks to the amount of $2,007.55, indorsed for collection for Commercial National Bank, which constituted the first dealings or transactions between the two banking associations. Upon the receipt of complainant's acceptance of its said second proposition the Fidelity National Bank caused to be prepared and forwarded to the Commercial National Bank a stamp to be used by it in indorsing paper transmitted for collection, under and in pursuance of the contract and agreement then entered into between the two banks. The impression or indorsement made by said stamp was this:

"Pay Fidelity Natl. Bank of Cincinnati, O., for collection for Commercial Natl. Bank of Philadelphia. E. P. GRAHAM, Cashier."

Commencing with its letter of acceptance of said second proposition, complainant continued to forward to the Fidelity National Bank, for collection, commercial paper, consisting of checks, drafts, and promissory notes, payable in the designated territory either at sight or on demand, or at a certain time after date or after demand, until June 21, 1887,

when the Fidelity National Bank, having become insolvent, was closed by the comptroller of the currency, and soon thereafter defendant was appointed receiver of its assets, and its charter was forfeited. Upon all the paper which complainant transmitted to the Fidelity National Bank for collection under the contract formed by the acceptance of said second proposition, there was placed by the use of the stamp furnished by the Fidelity National Bank the above special indorsement:

"Pay Fidelity Natl. Bank of Cincinnati, O., for collection for Commercial Natl. Bank of Philadelphia.            E. P. GRAHAM, Cashier."

At the date of its failure and suspension, the Fidelity National Bank had not accounted for paper so indorsed and transmitted by complainant between the 4th and 20th June, 1887, to the amount of $16,000 or $17,000. There is no dispute as to the items making up said amount, or as to the fact that each of said items were duly received by said Fidelity Bank, and have, upon each item or piece of paper, the special indorsement aforesaid. It was not understood or intended by either the transmitting or the receiving bank that the title to the paper sent forward for collection should pass to or be vested in the Fidelity Bank; on the contrary, the agreement and understanding between them contemplated (what was expressed by the proposition made and accepted, and the indorsement placed on the paper) that the title to all such paper should be and remain in the complainant, who neither opened or intended to open any deposit account with the Fidelity National Bank. Previous to this special arrangement entered into between them, they had had no business connection or transactions, and kept no accounts with each other. All the paper forwarded by complainant between the 4th and 20th June, the proceeds of which are involved in this controversy, was transmitted in letters having the printed form of letter-heads, as above indicated; and in conformity with the general usage and course of business between banks occupying towards each other such relation as the contract in question created, or sending and receiving commercial paper for collection, a distinction was made between such paper as was payable at sight or on demand, and such as was payable at a certain day, after date or after demand. The former were designated as "cash items," and the latter as "time paper." The course of business between the two banks, and the method of keeping their accounts with each other, were as follows: When "cash items" were transmitted by complainant to the Fidelity National Bank, including these embraced in the present controversy, they were entered as of the date of their transmission on the foreign cash item book of the former, and from said book such entries were posted into the general account of the Fidelity Bank on complainant's books, as of such date; and, when such "cash items" were received by the Fidelity National Bank, it credited the same on its books to the complainant as of the date received, and charged the same to its correspondents to whom such "cash items" were sent by it for actual collection. If such "cash items" were not paid on presentation, the Fidelity National Bank would charge them back to complainant, and re-

turn them, whereupon complainant would credit the Fidelity Bank with the same upon the account which it kept against the latter. When the complainant transmitted "time items," or papers including that covered by this suit, the same were entered on complainant's foreign collection register as of the date of transmission, and were not entered upon the general account of the Fidelity National Bank, upon the books of the Commercial National Bank, until advice was received from said Fidelity Bank that such time items had been collected. The Fidelity National Bank neither credited nor remitted complainant such time items until it had received advice from its correspondents of their payment. The books of the Fidelity National Bank show to whom it sent all the paper, both "cash" and "time items," for collection, and when the same was collected by its correspondents, with all or most of whom it had currrent accounts showing balances in favor of or against said Fidelity Bank from day to day, and at the time of its suspension. Up to June 4, 1887, the Fidelity National Bank, in pursuance of, and in compliance with, its contract and agreement, made remittances with complainant on the 1st, 11th, and 21st of each month of collections made up to the date of each remittance, accompanying the same with a statement of the several collections made and included in such remittance. Such statements designated and identified the separate items of paper which had been collected. Such remittances, together with any and all such cash items as were not paid on presentation, were, by the Fidelity Bank, charged back against the complainant on the books of the former, and were credited to the Fidelity on the books of the complainant. Under date of May 25, 1887, the complainant's cashier, E. P. Graham, wrote the cashier of the Fidelity Bank as follows:

"DEAR SIR: We do not wish to complain, but would like to understand why your remittances of May 21st only included items sent you up to May 14th, and received by you on the 16th. We have to explain these things to our depositors, and wish to act intelligently on the subject. Yours, etc. "————.""

To this communication the Fidelity National Bank, through E. L. Harper, vice-president, returned the following reply:

"GENTLEMEN: We collect at par, and include in our remittances everything collected to date."

The complainant made no objection to this construction of its undertaking of the Fidelity National Bank, but acquiesced therein, and continued to transmit paper for collection under the contract as thus interpreted, such paper being charged and credited as already stated.

On the foregoing statement of facts three leading questions are presented for consideration and determination: *First*, what, under their contract and course of business, was the relation created between the two banks in respect to the commercial paper which complainant sent to the Fidelity Bank for collection? *Second*, what, if any, change or modification of that relation was made or effected as to the proceeds of such paper after actual collection thereof by the Fidelity National Bank, or its correspondents? And, *third*, how far, or to what extent, can complainant

follow and impress upon the proceeds of such paper a trust such as will entitle it to a recovery out of funds in the hands of the receiver?

For the complainant it is insisted that the relation established by the contract, and the indorsement placed upon the paper transmitted for collection, was only that of principal and agent; that the title to the paper and to the proceeds thereof never passed to the Fidelity National Bank, but remained in itself; and that the Fidelity National Bank having, as such agent, collected its paper, and failed to account for the proceeds, the amount thereof so received constituted a trust fund which complainant may rightfully follow, and recover in full out of the general assets of the Fidelity Bank which have or may come into the hands of the defendant as the receiver of the same. The defendant controverts those propositions, and claims that the agreement and course of dealings established between the two banks no other relation than that of creditor and debtor; that in respect to sight or demand paper, designated as "cash items," which complainant, at the date of its transmission, charged up to the Fidelity National Bank, and which the latter, on receipt thereof, credited to the complainant, such relation of creditor and debtor arose when such paper was received by the Fidelity Bank, and credited on its books to the complainant; that in respect to paper payable on a certain day after date or after demand, called "time paper," the creditor and debtor relation between them commenced upon the actual collection of such paper, and when the Fidelity National Bank gave complainant credit for the same. It is further claimed for the defendant that the proceeds of all such paper received and collected were so mingled and blended by said Fidelity National Bank with its own funds and credits as to be undistinguishable or incapable of identification, and that for the amount of its debt or claim complainant can only share *pro rata* with other creditors of the Fidelity National Bank in the distribution of its assets in defendant's hands.

The facts and circumstances specially relied on by counsel for defendant to support their contention of a creditor and debtor relation between the two banks are—*First*, the printed words, "For collection, ———; for credit," found in the letter-heads used by complainant in transmitting paper to the Fidelity Bank; *secondly*, the act of the parties in debiting and crediting the "cash items" at the dates of transmission and receipt; and, *thirdly*, the statement made by complainant's cashier, Mr. E. P. Graham, that in thus charging the Fidelity Bank with such "cash items" he understood or intended that the latter thereupon became indebted to his bank. It is true that Mr. Graham in his deposition makes such a statement, but his meaning, as subsequently explained, was obviously that the Fidelity National Bank was chargeable with such items, and would, upon the collection thereof, be liable to complainant for the same. He hardly meant to be understood that upon his bank's making such a charge as paper transmitted, the property in such paper thereupon vested in the Fidelity Bank; for in other portions of his testimony he clearly states that it was not intended to transfer the paper to the collecting bank, or to open any deposit account with it. On the other

hand, the Fidelity National Bank did not understand or so interpret the contract as to consider itself absolutely bound to the complainant for all such paper as so much money deposited with it, or that by crediting the complainant with the amount thereof it becomes the owner of the paper. This is clearly shown in its reply to complainant's letter of May 25, 1887, where it is said: "We collect at par, and include in our remittances everything collected to date," (of remittances.)

This contemporaneous construction placed upon its undertaking by the Fidelity Bank is inconsistent with the idea that an actual, present indebtedness arose upon its receipt of such paper for the amount thereof, so that it thereupon became the owner of the same. The parties in this contract made no distinction between "time paper" and "cash items." The same indorsement, "Pay Fidelity National Bank of Cincinnati, Ohio, for collection, ———, for Commercial National Bank of Philadelphia, Pa.," was placed upon both classes of paper alike. In keeping their account with each other "cash items" were charged and credited before, and "time paper" after, collection. This difference in time of making such entries cannot, when considered in connection with the express agreement of the parties, operate to split up their contract, so as to make one rule for "cash items" and another for "time paper." There was no such understanding. But, in connection with the mode adopted of charging and crediting "cash items" transmitted and received, it is said by counsel for defendant that the Fidelity National Bank in some instances remitted to complainant on the dates designated before actual collection; that "cash items" received, say on the 10th of May, would, in some cases, be remitted on the 11th of May, before the same was collected by the Fidelity Bank. If any such instances actually occurred, (which does not appear satisfactorily to be the fact,) the act of remitting was wholly gratuitous on the part of the Fidelity Bank,—was not in accordance with its own interpretation of its undertaking, and could not have the effect of annulling or modifying the real contract of the parties. Nor can the printed words, "For collection, ———; for credit," found in letter-heads which complainant generally used in forwarding paper to the Fidelity Bank, control the express written contract of the two banks. That contract is found in the proposition made by the one and accepted by the other. The offer was to "collect at par all points west of Pennsylvania, and remit the 1st, 11th, and 21st of each month." In accepting that proposition complainant did not intend by the use of printed letter-heads containing the words, "For collection, ———; for credit," to change or modify the offer made by the Fidelity Bank, or to suggest a different arrangement; neither did the Fidelity Bank so understand complainant's letter of acceptance. The printed words, "For collection, ———; for credit," cannot now be reverted to for the purpose of showing a different contract or arrangement from that embraced in the proposition made and accepted. Any such operation and effect given to these printed words would do manifest violence to the clear intention of the parties, and violate the well-settled rule that printed words, such as, "For collection, ———; for credit," must be con-

trolled by the written proposition made and accepted, if the latter is inconsistent with the former. Ordinarily, when a customer sends commercial paper to a bank to credit the proceeds, and such credit is given when the paper is collected, if nothing more appears, the relation thereby created between the parties is that of creditor and debtor. The bank becomes the customer's debtor for the amount so credited, subject to payment on demand, but is under no duty or obligation to remit. In the present case the arrangement proposed in and by the second proposition involved the performance by the Fidelity National Bank of two agency duties and functions, viz., the undertaking to collect all papers payable west of Pennsylvania, sent it by complainant, and the obligation to remit the proceeds at or upon designated dates. In addition to the agency services contemplated, the special or restrictive indorsement (the form of which was made and suggested by the Fidelity Bank) placed upon the paper transmitted by complainant, would, in and of itself, have created the relation of principal and agent between the two banks.

We think this is settled by the rule laid down in *White* v. *Bank*, 102 U. S. 660, 661, and by the decisions of this court in *Winters* v. *Armstrong*, 37 Fed. Rep. 508, and *Montgomery Nat. Bank* v. *Armstrong*, 36 Fed. Rep. 59. In the latter case the indorsement which the transmitting bank placed upon the draft forwarded to the Fidelity Bank, was, in all essential particulars, the same as that employed by complainant, and this court held that the relation thereby created between the two banks was that of principal and agent; and the Montgomery National Bank, having traced the proceeds of its paper into the receiver's possession, was allowed to recover the same as a trust fund. In the *Montgomery Bank Case* there was, besides the special indorsement, a direction, contained in the letter of transmission, to remit the proceeds of the collection, without any specification as to the time of remitting. Here the dates for making remittances are specified. In the *Montgomery Bank Case* the law fixed or prescribed "a reasonable time" from date of collection in which the remittance by the agent should be made. Here the parties have in advance agreed upon and designated the time or times for remitting. This difference is insufficient to distinguish the two cases. But the question is put beyond all doubt, if, as we may properly do, we read into the restrictive indorsement which complainant placed upon all the paper it transmitted the special contract of the parties, made by complainant's acceptance of said second proposition. It would then stand thus: "Pay to the Fidelity Natl. Bank for collection for Commertial Natl. Bank of Philadelphia, Pa. This paper is to be collected at par, and the proceeds remitted to the Commercial National Bank on either the 1st, 11th, or 21st days of the month next after day of collection, without exchange." That such an indorsement as this would make the receiving bank the agent of the transmitting bank admits of little or no debate. The contract of the parties, taken in connection with the special indorsement agreed upon by both, renders it clear, both upon principal and authority, that, so far as concerns the paper in question, the relation between complainant and the Fidelity

National Bank was not that of creditor and debtor, but that of principal and agent.

The next question presented is, did they occupy any other or different relation to each other as to the proceeds of such paper after actual collection thereof by the agent bank or by its subagent? The agency relation being established as to the paper, the money received thereon should stand upon the same footing, and be held in the same capacity, by the collecting bank. The relation of principal and agent as to the proceeds of such paper could not be changed to that of creditor and debtor without the consent or concurrence, express or implied, of both parties. The agent certainly could not, by an act of his own, divest himself of his fiduciary character in respect to the proceeds of paper he had collected as agent. His method of keeping his accounts with his principal would not terminate his agency relation, or convert him into a mere debtor, without the assent, express or implied, of his principal. In the present case there was no intention, express or fairly to be implied, that the parties considered the proceeds of the paper as standing upon a different footing from the paper itself. The accounts which they mutually kept of their business were properly principal and agency accounts, as distinguished from creditor and debtor accounts. They were kept in the usual way banks keep their collection accounts. It was not the understanding of either (certainly not of complainant) that any creditor or debtor relation as such was to be credited in respect to the proceeds of paper sent out for collection. The first proposition submitted by the Fidelity National Bank perhaps contemplated a creditor and debtor connection, but the second, third, and fourth upon their face did not. Aside from the contract embodied in the accepted proposition, the plain meaning of the special indorsement used is that the Fidelity National Bank was to collect the paper and receive the proceeds "for account" of the complainant, and such proceeds were to be remitted on certain days next after collection. We think it clear that the principal and agency relation created as to the paper continued as to the proceeds thereof. Such being the relations of the two banks, the remaining question is how far, or to what extent, can complainant follow and impress upon the proceeds of its paper a trust as against the funds in the hands of the defendant as receiver of the Fidelity National Bank's assets? When an agent, or one occupying a fiduciary position, converts trust property or moneys to his own use, or improperly invests the same in other credits or securities, two remedies are open to the principal. He may elect to treat such agent as his debtor for the amount, or he may follow his property or funds, so long as the same can be traced and identified, until they reach a *bona fide* holder thereof without notice of his right, and impress upon them, either in their original or substituted form, a trust. The complainant seeks the latter remedy, and, through its counsel, claims that a trust should be established in its favor against all the assets of the Fidelity Bank in the possession of defendant, without imposing upon it the duty of tracing its funds into the receiver's hands, because such funds, whether actually received by the defendant as receiver or not,

have gone to swell the estate or assets of said Fidelity National Bank. Some cases are cited which seem to support this position, but they are not sound in principle, nor in harmony with the decided weight of authority. In seeking to follow and impress a trust character upon funds which an agent has misapplied, it is incumbent upon the principal to clearly trace such funds into the hands of the party against whom the relief is sought; and, so long as the trust fund or property, in either its original or substituted form, can be traced and identified, it may be followed and recovered by the true owner, provided it has not come into the possession of some *bona fide* holder for value without notice. This right of the principal "only ceases when the means of ascertainment fails," or when his property or fund has reached a *bona fide* holder for value, and without notice of the trust.

It is not deemed necessary to review the numerous authorities on this question. The rule is now well settled by repeated decisions both of the state and federal courts, which have followed and applied the principle laid down by Lord ELLENBOROUGH in *Taylor* v. *Plumer,* 3 Maule & S. 562. The leading cases in this country are here simply referred to: *Overseers of the Poor* v. *Bank,* 2 Grat. 544; *Whitley* v. *Foy,* 6 Jones, Eq. 34; *Thompson* v. *Perkins,* 3 Mason, 232; *Kip* v. *Bank,* 10 Johns. 63; *Van Alen* v. *Bank,* 52 N. Y. 1; *Bank* v. *King,* 57 Pa. St. 202; *Cook* v. *Tullis,* 18 Wall. 332; *Schuler* v. *Bank,* 27 Fed. Rep. 424; *Bank* v. *Insurance Co.,* 104 U. S. 54; *Winters* v. *Armstrong,* and *Montgomery Nat. Bank* v. *Armstrong,* heretofore decided by this court. Those authorities impose upon complainant the duty of tracing the funds it seeks to have impressed with a trust character into the defendant's possession, either in their original or in some substituted form, and the burden of identification is imposed upon all owners seeking to follow their property or its proceeds. No well-considered case has gone to the extent of holding that, when an agent converts or misappropriates his principal's property or funds, and thereafter fails, his general estate will be impressed with a trust for the reimbursement of such principal, on the ground that such estate has been benefited, and to an equal amount, by the agent's breach of duty. Every creditor could rest a like claim to priority of satisfaction on the same ground. The right of the owner to follow and recover his property rests upon a principle altogether different. In the present case the complainant, upon the doctrine of the cases cited, can only recover from the defendant such portions of the proceeds of its paper as it can trace into the hands of the receiver, either in their original or in some substituted form. The Fidelity National Bank having debit and credit balances with its numerous subagents or correspondents, who made the actual collection of complainant's paper, this court, upon the preliminary hearing of the cause, directed a reference to a special master to ascertain and report what funds derived from complainant's paper had come into the defendant's possession as receiver. The special master made his first report in the premises, which showed that complainant's said funds were mostly collected by subagents of the Fidelity Bank; that such subagents, having mutual accounts with the Fidelity National

Bank, credited the latter with the amount of such collection, and that at the date of the Fidelity Bank's suspension it had credit balances with some and debit balances with other of such subagents. This still left the fact sought to be ascertained in some doubt, and the court thereupon directed the special master to make an amended and supplemental report, and show what portion of the paper transmitted by complainant to the Fidelity National Bank between the 4th and 20th June, inclusive, was collected by correspondents of said Fidelity Bank, and credited to the latter, and in what cases the accounts between said Fidelity Bank and said correspondents exhibited a continuous balance due the former from the latter down to the date of the Fidelity Bank's failure, as large or larger than the amount of the proceeds of complainant's said paper so collected and credited by said correspondents, respectively, to said Fidelity Bank, and in what instances, and to what amounts, such balances so due from said correspondents at the time of the Fidelity Bank's suspension were subsequently paid over to and received by the defendant. The special master filed his amended report on the 27th of May, 1889, showing that the defendant had, subsequent to the suspension of the Fidelity Bank, received from said correspondents the proceeds of complainant's said paper to the amount of $7,209.59. Under the authorities the complainant could have reached and subjected those credits in the hands of said correspondents, which were made up by the proceeds of its paper. It can still follow the same in the hands of the defendant, to whose possession the funds belonging to complainant are thus clearly traced to the extent of $7,209.59.

Various exceptions are taken to the master's original and amended reports. They need not be noticed or considered in detail. In the judgment of the court the findings and conclusions of the special master are clearly sustained by the evidence, and the exceptions are overruled, and said amended report of May 27, 1889, is found to be correct, and is confirmed. A decree will be accordingly entered for complainant, directing the defendant to pay over to it or its counsel of record said sum of $7,209.59, and such dividend as he may hereafter receive on the sum of $1,577.89, collected by the Fifth National Bank of St. Louis on complainant's said paper, and credited to the Fidelity Bank. Each party will pay half the costs herein, including the fee of the special master, which is fixed by the court at the sum of $150.