CLARK SPARKS & SONS MULE & HORSE CO. v. AMERICUS NAT.
BANK et al.

(District Court, S. D. Georgia.   March 13, 1916.)

1. BANKS AND BANKING ⬅116(1)—KNOWLEDGE OF CASHIER—NOTICE.
    Where the assistant cashier of a bank knew of its insolvent condition,
    such knowledge is imputable to the bank and its board of directors.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 282;
    Dec. Dig. ⬅116(1).]

2. BANKS AND BANKING ⬅75—COLLECTIONS—INSOLVENT.
    Where a bank had knowledge of its insolvency when it collected a draft
    sent it for collection, and withheld notice from the owner of the draft, such
    fraud precludes it from acquiring title to the draft.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 157;
    Dec. Dig. ⬅75.]

3. BANKS AND BANKING ⬅159—COLLECTIONS—TITLE.
    Where a draft is sent a bank solely for the purpose of collection, title
    does not vest in the bank.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 547–
    553;  Dec. Dig. ⬅159.]

4. TRUSTS ⬅372(1)—TRUSTEES—PAYMENTS OUT OF TRUST FUNDS.
    Where money belonging to a cestui que trust is traced into a general
    mass in the hands of the trustee, and the trustee makes payments out of
    the mass, it is always presumed that he makes such payments out of his
    own funds, and the cestui que trust is entitled to trace his money into the
    residuum.
        [Ed. Note.—For other cases, see Trusts, Cent. Dig. § 600;  Dec. Dig. ⬅
    372(1).]

5. BANKS AND BANKING ⬅80(8)—COLLECTION OF DRAFT—PROCEEDS—TRACING.
    Complainant drew a draft for over $6,000 for payment for a shipment of
    live stock, which was forwarded to an insolvent bank for collection.   The
    debtor agreed to take up the draft by giving his notes to the insolvent
    bank.   Notes of the debtor to the amount of $6,000 were given, and the
    bank pledged such notes, with others, to a correspondent bank, which paid
    over the amount of the loan.   At all times thereafter the defendant bank
    had on hand cash in excess of the amount of the draft.   *Held* that, as the
    assets of the bank were increased in the sum of $6,000, complainant is en-
    titled to priority in payment out of the cash on hand to the amount of
    $6,000;  and as the debtor took up the remainder of the draft by a shift-
    ing of credits which did not increase the assets of the bank, complainant
    is not entitled to priority as to the amount of its claim in excess of $6,000.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 192;
    Dec. Dig. ⬅80(8).]

6. BANKS AND BANKING ⬅80(8)—PRIORITIES—INTEREST.
    In such case complainant is not entitled to any interest on the amount
    of his draft.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 192;
    Dec. Dig. ⬅80(8).]

7. BANKS AND BANKING ⬅80(3)—PRIORITIES—STAY.
    In such case, as there might be others entitled to priorities out of the
    cash turned over to the receiver, the receiver of the insolvent bank will
    be given a period of 30 days in which to call to the court's attention such
    priorities.
        [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 192;
    Dec. Dig. ⬅80(3).]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Bill by the Clark Sparks & Sons Mule & Horse Company against the Americus National Bank and N. M. Dudley, its receiver. Decree for complainant.

Bill in equity for recovery of collection made by national bank on eve of its failure. The evidence shows that complainant on January 7, 1914, drew a draft for $6,272.50 on one J. J. Hanesley, of Americus, Ga., for a shipment of live stock, and deposited same for collection in his bank, the National Stockyards National Bank, in Illinois, and that said bank forwarded same for collection to the Americus National Bank, of Americus, Ga., and that said bank presented said draft to the drawee for payment on January 9, 1914. Said drawee was engaged in the live stock business, and, in expectation of this shipment of stock and the drawing of this draft, had applied to the Americus National Bank three or four weeks before this time to ascertain the condition of his account, and on finding that same was apparently overdrawn he made arrangement to pay the expected draft by a check on his account in the bank, and was then to give his notes to protect his check. On January 9th, therefore, he took up the draft of complainant by giving his check to the Americus National Bank for the sum of $6,272.50, with exchange added, same being drawn on said bank, and this check was charged against him by said bank, and resulted in an overdraft against him. A week afterwards Mr. Hanesley, in pursuance of the arrangement which he had previously made, as above stated, in order to cover his overdraft with the bank and protect his check, gave to said bank his two notes, dated January 9th and due in October, 1914, with interest included in the notes to maturity; the then cash value of the notes, however, being $6,000. On January 25, 1914, these notes, with others belonging to the Americus National Bank (the total amount of these notes being $24,562.60), were by that bank hypothecated with the National Park Bank of New York, as collateral security for a loan of $20,000, which was then made with said bank and placed to the credit of the Americus National Bank. Between that time and the time when the doors of the Americus National Bank were closed, on February 2, 1914, nearly all of said funds in the National Park Bank were withdrawn by the Americus National Bank by the sale of New York exchange made by the Americus National Bank; said bank receiving cash for such exchange. In this way nearly all of said loan of $20,000, for which said Hanesley notes and other notes were deposited as collateral, was withdrawn from the New York bank, and placed in the Americus bank. The amount left in the New York bank at the time of the failure of the Americus bank was less than $2,000, which amount was credited by the New York bank on the above-stated loan and a previous loan which it had made to the Americus bank. When the Americus National Bank failed, on February 2, 1914, it had in its safe in cash the sum of $7,082.46, which was turned over to its receiver. From January 9, 1914 (when Mr. Hanesley paid his draft), and also from January 25, 1914 (when the loan of $20,000 was secured from the New York bank), up to the time when the Americus bank closed its doors, there was constantly on hand in said bank cash, as shown by the evidence, each day, of at least $7,000. At the hearing of the case the evidence showed that the Hanesley notes were good, and that more than $4,000 had been paid on same after the receivership.

The Hanesley draft was handled and collected by one Wheatley, who was assistant cashier of the Americus bank, and on January 9th this assistant cashier wrote to the National Stockyards National Bank, advising that he was on that day remitting "your collection J. J. Hanesley $6,272.50 sent us in yours of the 7th"; and on that day said Wheatley drew New York exchange for the amount of said collection, but, instead of forwarding same, he put it in an envelope and in the vault of the Americus National Bank, where it remained until the receiver took charge. On January 23d the National Stockyards National Bank wired the Americus bank that it had not received the remittance, and asked for a duplicate remittance to be forwarded at once, and thereupon, on January 27th, the Americus bank wired the other bank that it had located the remittance and had forwarded same by special delivery, with interest, which, however, was not done. The National Stockyards National Bank, on January 31st, again wired the Americus bank that it had not received the remittance, whereupon, on January 31st, Mr. Lowrey, the cashier of the Amer-

icus bank, made out new New York exchange, and forwarded same to the National Stockyards National Bank, which received same on February 2d and immediately forwarded it to the National Park Bank of New York, where it was presented on the 4th, when payment was refused, because the Americus bank had already been placed in the hands of a receiver. At the time that the Hanesley draft was collected by the Americus National Bank, it was hopelessly insolvent, and from the conduct of Mr. Wheatley, the assistant cashier at the time, and from the other evidence in the case, the court is of the opinion that Mr. Wheatley was fully aware of the insolvency of the Americus bank when he collected the draft. Mr. Lowrey, the cashier, denied that he knew of this insolvency until some three weeks afterwards, just before the bank closed its doors. Neither the complainant nor the National Stockyards National Bank knew of the insolvency of the Americus National Bank, and neither had any account with this bank, but the draft in question was sent merely for collection and remittance of proceeds.

Harris, Harris & Witman, of Macon, Ga., for complainant.

W. A. Dodson, of Americus, Ga., for receiver.

LAMBDIN, District Judge (after stating the facts as above). The question here presented is whether the complainant, who forwarded the draft in question for $6,272.50 for collection to the Americus National Bank, which collected same in the manner stated above, but failed to remit the proceeds before its failure, is entitled to priority of payment over the general creditors of that bank.

[1] 1. The assistant cashier, Wheatley, who handled the draft in question, was fully aware of the insolvency of the Americus bank when he made the collection, and the court is of the opinion that this knowledge should be imputed to the bank itself. At any rate, it was the duty of the directors of the bank to know of its insolvency, and it is presumed that they had knowledge of same. Lowry Banking Co. v. Empire Co., 91 Ga. 624, 17 S. E. 968; State v. Quackenbush, 98 Minn. 515, 108 N. W. 953; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49; Manhattan Bank v. Walker, 130 U. S. 627, 9 Sup. Ct. 519, 32 L. Ed. 959; Tate v. Bates, 118 N. C. 287, 24 S. E. 482, 54 Am. St. Rep. 719.

[2] (a) The bank being thus hopelessly insolvent at the time that it received and collected the draft, and the officers of the bank having knowledge of this insolvency, or being presumed to have knowledge of such insolvency, the Americus bank, on account of this fraud, did not acquire title to the draft, or to the proceeds of the collection of same. Wasson v. Hawkins (C. C.) 59 Fed. 233; Richardson v. Olivier, 105 Fed. 277, 40 C. C. A. 468, 53 L. R. A. 113; 5 Cyc. 493, and cases cited in notes.

[3] (b) Furthermore, from the facts above stated, and from other facts shown by the evidence, including the fact that this Hanesley draft was sent to the Americus bank solely for collection and remittance of proceeds, the court is of the opinion that on this ground also the title to this draft and its proceeds never left the complainant, as the Americus bank was a mere agent for the collection of the draft. 5 Cyc. 493, and cases cited in notes; Fifth Nat. Bank v. Armstrong (C. C.) 40 Fed. 46.

[4-6] 2. For both these reasons complainant is entitled to recover the proceeds of this draft from the receiver of the Americus bank,

provided it is able to trace and identify the proceeds derived from the collection of same. This brings the court to the consideration of the next question in the case, which is whether the complainant has been able to trace and identify the proceeds of the collection of this draft. It appears that the draft was paid by a check drawn by Mr. Hanesley on his deposit with the Americus National Bank for $6,272.50 and exchange, and that by previous arrangement with the Americus bank, Mr. Hanesley paid $6,000 of this amount with his two notes, which were dated January 9, 1914, the day the draft was paid, and which fell due October following. The court is of the opinion that, since these two notes were used by agreement for the payment of this draft to the amount of $6,000, they can be considered as a part of the proceeds of the collection of this draft, and a substitution for same. The amount of the draft above $6,000 was paid by a mere shifting of credits in the Americus bank, and did not add to or increase its assets, and consequently the court is of the opinion, under the ruling in the case of Anheuser Busch Brewing Association v. Clayton, 56 Fed. 759, 6 C. C. A. 108 (C. C. A. 5th Cir.), that complainant cannot recover the excess over $6,000, which was the cash value at the time of the notes Mr. Hanesley gave the bank, so as to pay the draft in question.

These notes, as stated above, along with other notes, amounting to $24,562.60, were taken by the cashier of the Americus National Bank to New York and hypothecated with the National Park Bank as security for a loan of $20,000, which was then made by the National Park Bank to the Americus bank, and nearly all of this loan, by the sale of New York exchange, was transferred from the New York bank to the Americus bank. The Hanesley notes, which were good, were transformed into a part of this loan, and thus became a part of the funds so transferred to the vault of the Americus bank. At no time between the payment of the draft in question, or the making of said loan in New York, and the date when the Americus bank closed its doors, was the cash on hand in said bank less than $7,000. The court is therefore of the opinion that the proceeds from the collection of said Hanesley draft to the amount of $6,000, which was represented by the Hanesley notes so deposited with the New York bank, increased the assets of the Americus National Bank to the extent of said sum of $6,000, and that this sum has been traced and identified in the residuum of over $7,000 which was turned over to the receiver when the Americus bank closed its doors. Since the modern doctrine of equity in such matters was enunciated in the leading English case of Knatchbull v. Hallett (In re Hallett's Estate) 13 Ch. Div. 696, which has been quoted approvingly many times by the Supreme Court of the United States, it is no longer necessary to trace the identical money by any earmarks which it may have; but, if the money in question can be traced into a general mass of money, equity will follow the money by taking out the same quantity. National Bank v. Connecticut Mutual Life Ins. Co., 104 U. S. 54, 26 L. Ed. 693.

Where money belonging to a cestui que trust is traced into a general mass in the hands of a trustee, and the trustee makes payments out of this mass, it is always presumed that he makes such payments out of his own funds, and not out of the money of the cestui que trust, which has gone into this mass, and the cestui que trust is therefore entitled to trace his money into the residuum. Boone County Nat. Bank v. Latimer (C. C.) 67 Fed. 27; 39 Cyc. 539 and 540, and cases cited in notes; Piano Manufacturing Co. v. Auld, 14 S. D. 512, 86 N. W. 21, 86 Am. St. Rep. 769; In re Berry, 147 Fed. 208, 77 C. C. A. 434. The court is therefore of the opinion that, under the facts in this case, the complainant is entitled to a decree against the receiver for the sum of $6,000, represented by the cash value of the Hanesley notes at the time they were given. Commercial Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363; Western German Bank v. Norvell, 134 Fed. 724, 69 C. C. A. 330; Butler v. Western German Bank, 159 Fed. 116, 86 C. C. A. 306; Richardson v. New Orleans, etc., Co., 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67; Richardson v. New Orleans Coffee Co., 102 Fed. 785, 43 C. C. A. 583; Richardson v. Continental Nat. Bank, 94 Fed. 450, 36 C. C. A. 315; Goshorn v. Murray (D. C.) 197 Fed. 409; E. B. Macy v. Roedenbeck (C. C. A. 8th Cir.) 36 Am. Bankr. Rep. 31, 227 Fed. 346, —— C. C. A. ——, and cases cited in same; St. Louis Ry. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683.

(a) However, under the ruling in the case of Richardson v. Louisville Banking Co., 94 Fed. 442, 36 C. C. A. 307, complainant is not entitled to any interest.

[7] 3. A suggestion is made that there are possibly other persons who claim priority in the same fund that was turned over by the bank to the receiver when it closed its doors. The receiver in this case will be allowed 30 days in which to call the attention of the court to any other claim which is entitled to such priority.

A decree may therefore be entered in this case finding in favor of the complainant against the defendants, the Americus National Bank and its receiver, for the said sum of $6,000 as a preferred claim entitled to priority in payment out of the funds in the hands of the receiver in said cause ahead of the general creditors, and the complainant is also entitled to a decree for the remainder of its claim amounting to $272.50, but without priority, to rank along with the claims of the other unsecured creditors of the bank, giving the privilege, however, to the receiver, at any time within 30 days from this date, to call the attention of the court to any other claims which may be entitled to priority of payment, so that the court may take such further action in the matter as may be equitable and proper, in view of such other claims.